Elston SHAMBURGER and Signe
Shamburger, Plaintiffs and
Appellees,

v.

Clayton L. BEHRENS, Defendant
and Appellant.

No. 15505.

Supreme Court of South Dakota.

Argued May 19, 1987.

Decided Jan. 13, 1988.

Donald R. Shultz, of Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, for plaintiffs and appellees.

William G. Porter and Lonnie R. Braun, of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, for defendant and appellant.

SABERS, Justice (on reassignment).

This medical malpractice case is before this court for the second time. In *Shamburger v. Behrens*, 380 N.W.2d 659 (S.D. 1986), we reversed a jury verdict in favor of Dr. Clayton L. Behrens (Behrens) and remanded for a new trial because a jury instruction on good faith error by a physician was improper.

The second trial concluded with a jury verdict for Elston and Signe Shamburger (Shamburgers) which Behrens now appeals. After the verdict Behrens filed timely motions for a new trial and judgment notwithstanding the verdict. These motions were denied. Later Behrens filed a motion for relief from the judgment based upon alleged juror misconduct. This motion was also denied. Behrens appeals from these orders denying his requested relief. We affirm.

*Facts*

In May 1986, in preparation for upcoming trials in Pennington County, the clerk of courts sent out a "Personal Information Form" to prospective jurors. James R. Curtis (Curtis), received one, filled it out, and returned it to the clerk.

The clerk summoned Curtis as a prospective juror for this trial since nothing appeared on the returned form which would disqualify him as a juror. Curtis was seated on the jury and participated in the jury deliberations which resulted in a verdict favorable to Shamburgers. The vote of the jury was ten to two; Curtis was one of the ten.

The jury returned the verdict on July 1, 1986 and the trial court entered its judgment on July 2, 1986. The order denying a new trial and judgment notwithstanding the verdict were entered on August 7, 1986. Twenty days later Donald R. Shultz (Shultz), Shamburgers' attorney, received the following handwritten letter from Curtis:

8-26-86
Donald R. Shultz
P.O. Box 8110
Rapid City, SD 57709
Dear Mr. Shultz:

As a juror on your case against Dr. Clayton Behrens, I commend you for a job well done. I trust that it will not be appealed!

However, I have a felony conviction on my record which could be just the ammunition that Mr. Porter and his firm needs to file such an appeal.

If this information were revealed, along with how instrumental I was in the verdict and the large dollar amount awarded, an appeal would certainly be made.

If you wish to prevent this situation, I feel that withholding this information is worth a percentage of your fee similar to what you charged your clients.

If this case were to go to trial again, your chances of winning it a second time would be "slim to none"!

> Sincerely,
> /s/ James R. Curtis

Acting with responsible and ethical dispatch, Shultz contacted the judge who in turn called the Pennington County sheriff. A meeting was arranged between Shultz and Curtis at Shultz' law office. The conversation between the parties was taped. Curtis' demand for $30,000 was refused. He eventually left with $1,000 in marked bills. As Curtis left Shultz' office, he was arrested. He was subsequently charged and convicted of grand theft by threat and sentenced to a term in the state penitentiary.

After learning of Curtis' extortion maneuver, Behrens moved for relief from the judgment under SDCL 15-6-60(b). The motion was based upon not only the extortion attempt, but also subsequent findings that:

1) James Curtis' real name was James Curtis *Svihovec;*

2) James Curtis was convicted under the name *Svihovec* of mail fraud in Omaha, Nebraska on May 31, 1978, and received a five year sentence most of which was spent on probation;

3) James Curtis had been involved in other litigation in Pennington County particularly a foreclosure of a contract for deed proceeding in 1984.

### 1. WAIVER

It is undisputed that Curtis was not questioned about his qualifications during voir dire. Although no record was made of that portion of the trial, the parties agree on this point. The earliest anyone knew of the potential problem was when Shultz received the August 26, 1986 letter. Shamburgers argue that Behrens' failure to object or even question Curtis about prior felony convictions during voir dire constitutes waiver of his right to now complain.

The basis of this argument depends upon the function of the personal information form. Shamburgers take the position that Behrens had to question the prospective juror and could not rely upon the questionnaire. Anything less, they contend, is a waiver.

After the personal information form was received by the clerk, and there was nothing on the form which the clerk could discern would disqualify Curtis, the basic information was shared with the litigants. This is a common practice within this state. While the form may vary from circuit to circuit, the use of these forms has become a basic part of the jury selection process. The purpose of these forms is to shorten the time required for jury selection. It allows the attorneys to bypass routine questioning about name, age, children, and spouse's employment and to ask questions dealing with the pertinent issues at trial.

The personal information forms are not and were not intended to be a substitute for voir dire, but are merely a tool to aid trial efficiency. Nevertheless, the personal information form sent to Curtis contained a section asking potential jurors to inform the court if they were disqualified for jury duty for any one of several reasons, including "convicted felon not restored to civil rights." Either through mistake, misunderstanding or intent, Curtis did not mark the appropriate box. It is speculation to

assert that the correct information as to his status or former name would have been revealed through voir dire. Reliance upon the answers given in the personal information form and those given in voir dire both depend upon the honesty and capability of the potential juror.

Behrens' reliance upon the answers given by Curtis in the personal information form was not unreasonable and failure to question Curtis about prior felony convictions did not operate as a waiver. *State v. Delfs*, 396 N.W.2d 749 (S.D.1986).

## 2. JUROR QUALIFICATIONS

Juror Curtis was convicted of mail fraud in 1978 under 18 U.S.C. § 1341 (1982). He was sentenced to thirty days in prison and placed on probation for four years, eleven months. At the time of this trial he was no longer on probation because, apparently, his probation termination date had passed.

■ The qualifications of a petit juror are generally found at SDCL 16–13–10:

**Qualifications of jurors.** All citizens of this state, who are registered to vote and of sound mind and who are able to read, write, and understand the English language, and not justices or clerks of the Supreme Court or a judge of the circuit court or any court of the United States, or a court of limited jurisdiction, or licensed attorneys, or clergymen as defined in § 19–13–16 when jury service conflicts with their religious beliefs and *who have not been convicted of any felony unless restored to their civil rights* and who are not subject to disability by the commission of any offense which by special provision of law does or shall disqualify them, are and shall be competent persons to serve on all grand and petit juries within their counties respectively. (emphasis added)

Shamburgers argue that SDCL 16–13–10 does not exclude from jury service persons previously convicted of federal felonies who are no longer on probation or parole. Behrens argues that it does and that juror Curtis was disqualified. Even assuming Behrens' position is correct, Shamburgers' argument makes sense: "it would be ab-

surd to rule that a South Dakota felon statutorily restored to his civil rights by completion of his probation is a qualified juror, whereas a federal felon who had completed his probation was not a qualified juror sitting on a South Dakota jury." To hold that a federal felon is disqualified as a juror absent a demonstration that his civil status has been restored places an unreasonable burden on the system. To hold that the lack of such a demonstration can invalidate an otherwise valid verdict could be disastrous.

We hold that a person who has been convicted of a felony under federal law is not automatically disqualified as a juror under SDCL 16–13–10 where circumstances demonstrate he is no longer under the jurisdiction or control of the federal criminal system. Likewise, juror Curtis was not disqualified as a juror because involvement in prior litigation does not constitute cause for disqualification under SDCL 16–13–10.

## 3. RELIEF FROM THE VERDICT BASED UPON JURY MISCONDUCT

■ Shortly after the Curtis letter surfaced, Behrens requested relief from the judgment. The trial court denied the motion and in doing so found that there was no intrinsic or extrinsic influence upon the jury verdict; that the jury had not been tampered with or influenced by juror Curtis; that there was no showing of any substantial effect on the jury verdict by Curtis, and that to allow the post-verdict innuendos suggested by Curtis' letter to set aside the jury verdict would allow his threat to be condoned and give an unacceptable taint to the jury verdict. This is solid reasoning by the trial court.

■ A person seeking a new trial on the grounds of alleged juror misconduct has the burden in the trial court to show that the alleged misconduct materially affected his substantial rights. *Carpenter v. Union Baking Co.*, 67 S.D. 151, 290 N.W. 322 (1940). The standard to be used in reviewing the trial court's ruling is that the trial court is in the best position to evaluate

the relevance of undisclosed evidence or later discovered facts and their impact on the outcome of the trial. The trial court's denial of Behrens' motion for relief from judgment is reversible only for either an abuse of discretion or clear error of law in the exercise of its discretion. *State v. Wyss*, 124 Wis.2d 681, 716–718, 370 N.W.2d 745, 762 (1985); *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553, 104 S.Ct. 845, 849, 78 L.Ed.2d 663, 670 (1984).

In this case Behrens' proof failed to show any bias by juror Curtis against Behrens. Behrens' reliance upon *Delfs, supra,* is excessive because there the jurors' misconduct (failure to disclose prior DWIs in a DWI trial) was specifically prejudicial to the State and the State's position. The trial court held Behrens failed to establish Curtis' misconduct materially affected Behrens' substantial rights. He failed to show Curtis' misconduct affected the jury verdict, offering only sheer speculation and conjecture as to what might have been in the juror's mind. The moving party has the burden of showing the alleged misconduct materially affected his substantial rights. There is a failure to sustain that burden of proof in this case.

Behrens claims that the sheriff's interview and Curtis' extortion interview with counsel for Shamburgers suggest Curtis' extortion idea was formulated before the verdict was reached. As indicated by counsel, this suggestion is then "bootstrapped" into seeds of disaster planted by Curtis *before* trial setting the stage for depriving Behrens of a fair adjudication. Behrens urges that the extortion letter is proper evidence of Curtis' prejudice and deceit in the jury's verdict. This overlooks the applicable statutory law requirements on impeachment of a verdict.

The statutory basis for impeachment of a jury verdict on claimed misconduct of a juror based on testimony from a juror is governed by SDCL 19–14–7, (Rule 606(b) of the Federal Rules of Evidence), which requires extrinsic as opposed to intrinsic interference with the jury deliberations:

**(Rule 606(b)) Juror's testimony prohibited as to deliberative process—Exception for improper influence—Affidavits and statements.** Except as otherwise provided by statute, upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. (emphasis added)

SDCL 19–14–7 seeks to reach an accommodation between policies designed to safeguard the institution of trial by jury and policies designed to insure a just result in individual cases. The rule was drafted as a rule of incompetency barring a juror from testifying as to motives, methods, or mental processes by which he reached his verdict. 3 Weinstein's Evidence ¶ 606[03], [04]. This rule operates to prohibit testimony concerning certain conduct by the jurors which has no verifiable outward manifestations. Extrinsic influences are admissible and a juror is competent to testify to irregularities such as intoxication, exposure to threats, acceptance of bribes, possession of knowledge relevant to the facts in issue not obtained through the introduction of evidence but acquired prior to trial, experiments, investigations, news media, etc. *Id.*

It is settled law in South Dakota that only extrinsic, as opposed to intrinsic, information may be used to impeach a jury verdict. *Duncan v. Pennington County Housing Authority*, 283 N.W.2d 546 (S.D. 1979); *State v. Luna*, 378 N.W.2d 229 (S.D. 1985); *State v. Finney*, 337 N.W.2d 167

(S.D.1983); *State v. Gallegos*, 316 N.W.2d 634 (S.D.1982).

A common ground for a motion for a new trial is that the jury, or members of it, has not performed in the fashion expected of juries. Attacks on this ground are frequently abortive because, as will be seen, the circumstances under which the jurors themselves may testify to impeach the verdict are very limited.

.    .    .    .    .

The correct rule is that a juror may testify about whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. A juror may not testify about statements made during the course of the jury's deliberation nor may he testify about the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to the verdict or about his mental processes in connection with the verdict.

11 C. Wright & A. Miller *Federal Practice and Procedure*, § 2810. In *Finney, supra* at 171, in a special concurring opinion, Justice Wollman emphasized the intrinsic evidence exclusion rule, stating that in close cases, it is better " 'to err upon the side of exclusion rather than receipt of [such] evidence.' "

■ Behrens fails to point to any evidence of improper pre-verdict bias or prejudice by juror Curtis. The claimed evidence of Curtis' thought processes must be excluded because it was not extraneous information brought to any juror's attention. Any possible prejudice or bias juror Curtis may have had in jury deliberations were part of his own mental process and not an extraneous influence. Thus, any post-trial evidence claiming his bias or prejudice must be excluded.

In *United States v. Eagle*, 539 F.2d 1166 (8th Cir.1976), the court stated a central purpose of the rule of juror testimony and competency is *"[T]he prevention of fraud by individual jurors who could remain silent during deliberations and later assert that they were influenced by improper considerations."* (emphasis added) *Id.*

at 1170. If there were no rule of juror testimonial incompetency, the secret thought of one juror would have the power to disturb the express conclusions of the jury as a whole. *Id.* For this reason courts have insisted that impeachment proof be limited to overt acts which are susceptible to the knowledge of other jurors. The court stated that the juror's actions did not go beyond the mental process of the juror and were not competent evidence to impeach and thus the verdict was upheld. *Id.*

As recently noted in *Tanner v. United States*, 483 U.S. ——, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), liberalization of the juror incompetency rule would weaken the system, not improve it.

There is little doubt that post-verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of *juror misconduct, incompetency,* or inattentiveness, raised for the first time days, weeks, or months after the verdict seriously disrupt the finality of the process. (emphasis added).

*Tanner; supra*, 483 U.S. at ——, 107 S.Ct. at 2747, 97 L.Ed.2d at 106.

There is simply no proof in this record that juror Curtis' improper conduct and plan had any effect on the verdict. In fact, there is no proof that his plan to extort money was even conceived before he wrote the letter, which was eight weeks after the jury verdict. Under this evidence, there is nothing to show that his extortion attempt was anything more than a poorly conceived afterthought. The trial court is affirmed because there simply is no proof in this record that juror Curtis' improper conduct had any effect whatsoever on the verdict.

We affirm for yet another reason. As stated by the trial court:

The attempted manipulation by Mr. Curtis cannot be condoned or supported and indeed to allow this to be set aside simply on those assertions by him subse-

quent to the verdict would be condoning to some degree his conduct or would be creating an inference of taint subsequent to a verdict which should not be accepted by this Court.

In other words, if an attempt at extortion is allowed to vacate a valid jury verdict, then we promote and reward the extortion attempt rather than exposing and punishing it. The jury verdict was reached on July 1, 1986. The letter containing the extortion threat was received almost two months later, on August 27, 1986. While the juror's conduct after the trial was reprehensible and has resulted in a criminal conviction, the trial court correctly held it was no basis for a new trial. Behrens has clearly failed to establish reversible error in the court's ruling. If he could sustain his burden of proof that he was prejudiced, then and only then should the jury verdict be vacated.

In the absence of proof that the extortion plan had an extrinsic causal connection with the jury deliberations or verdict, we affirm.

## 4. NATIONAL STANDARD OF CARE

■ Dr. Behrens is certified by the American Board of Surgery and is a Fellow of the American College of Surgery. He has been certified since 1954. He graduated from medical school in 1943. After two years in military service, a pathology residency and some general practice in eastern South Dakota, he completed another residency in surgery and then came to the Rapid City area where he has practiced his profession and had contact with Shamburger.

Shamburgers' medical expert, Dr. John E. DeLauro, is a surgeon from Denver, Colorado. He was not familiar with the setting in which Behrens worked. He testified that board certified surgeons must meet and comply with national standards in order to maintain their certification. It was his testimony that such surgeons should be evaluated on a national basis regardless of where they might practice. It was his medical opinion that there was a national standard for reducing the risk of infection in pre-operative and post-opera-

tive care and that Behrens failed to meet this standard.

In settling the instructions, the trial court determined that the applicable legal standard of care for measuring Behrens' actions should be a national standard of care. Over Behrens' objection the following instruction was given:

### Instruction 6

In determining whether the Defendant was negligent, you are instructed that the Defendant has the duty to have that degree of learning or skill ordinarily possessed by board-certified surgeons of good standing engaged in the same field of specialization in the United States under same or similar circumstances.

It is his further duty to use that degree of skill ordinarily exercised in like cases by board-certified members in good standing of his profession who are engaged in the same field of specialization in the United States and to be diligent in an effort to accomplish the purpose of which he is employed.

You will judge Defendant's performance in accordance with the standard of care applicable to him as of the time of events complained of which is April 7, 1980 through May 6, 1980.

These duties apply to pre-operative care and post-operative care. The failure to perform these duties is negligence.

In analyzing the applicable standard of care in South Dakota, we note that *Block v. McVay*, 80 S.D. 469, 126 N.W.2d 808 (1964) held that negligence of a physician or surgeon must be established by the testimony of medical experts in those cases where laymen are not qualified by learning or experience to judge the medical aspects of such case.

Also, there is no evidence indicating that there was any reasonable doubt as to whether he followed the proper practice prevailing throughout the medical profession. The type of evidence required upon which to base a finding of negli-

gence in this respect must of necessity be furnished by medical experts.

126 N.W.2d at 811–812.

*Fjerstad v. Knutson,* 271 N.W.2d 8, 12 (S.D.1978), involved both hospital and physician negligence and stated that:

Decedent had a right to expect that the treatment rendered by a hospital which maintains and staffs an emergency room would be commensurate with that available in the same or similar communities or in hospitals generally.

This statement appears to suggest both a national and local standard in the same sentence.[1] As authority for general or national standards, Fjerstad cited *Dickinson v. Mailliard,* 175 N.W.2d 588 (Iowa 1970). In addressing the standard of care for hospitals and physicians, the Iowa Supreme Court wrote:

It is no longer justifiable, if indeed it ever was, to limit a hospital's liability to that degree of care which is customarily practiced in its own community. This is particularly true when we recognize—as we must—that many communities have only one hospital. Adherence to such a rule, then, means the hospital whose conduct is assailed is to be measured only by standards which it has set for itself. There is no other hospital to which it may be compared.

This would permit a hospital to establish a negligent standard of care and later avoid liability by pointing to its own conduct as the norm by which negligence should be tested. *We have brushed aside many of these same arguments in connection with the skill to be exercised by a doctor in attending his patient,* and we have long compelled him to abide by the rules of good practice followed *generally under similar circumstances.* (Citations omitted.) (Emphasis added.)

175 N.W.2d at 596.

Numerous authorities support the adoption of a national standard of care for specialists in medicine.[2] We now hold that a medical specialist who holds himself out as such should be measured against the national standards of his profession. Based upon the foregoing reasons and authority, we hold that the trial court correctly instructed the jury as to the appropriate standard of care in this case.

## 5. FUTURE DAMAGES

■ Behrens asserts that the trial court improperly instructed the jury on the issue of future damages as no evidence had been presented to provide the jury with a foundation for assessing alleged future damages.

We find that evidence was presented that Elston Shamburger had suffered pain for five years prior to trial and no evidence was introduced to allege or support the

1. In *Magbuhat v. Kovarik,* 382 N.W.2d 43 (S.D. 1986), an appeal from a summary judgment order, we stated that the negligence standard for doctors is no different than that for other professionals, *citing Lenius v. King,* 294 N.W.2d 912 (S.D.1980), a legal negligence case. The *King* decision ascribes a locality rule as the standard of care for the legal profession, at least to the extent that it deals with questions peculiar to interpreting matters of South Dakota law. But, the reliance upon *King,* although logical, should be tempered because the decision dealt with the "good faith" instruction and not the locality rule as the standard of care.

2. *Early v. Noblin,* 380 So.2d 272 (Ala.1980); *Priest v. Lindig,* 583 P.2d 173 (Alaska 1978); *Kronke v. Danielson,* 108 Ariz. 400, 499 P.2d 156 (1972); *Greene v. Thomas,* 662 P.2d 491 (Colo. App.1982); *Logan v. Greenwich Hospital Ass'n.,* 191 Conn. 282, 465 A.2d 294 (1983) (abandoning a statewide rule); *Robbins v. Footer,* 179 App.D. C. 389, 553 F.2d 123 (1977); *Cronic v. Pyburn,* 170 Ga.App. 377, 317 S.E.2d 246 (1984); *Perin v. Hayne,* 210 N.W.2d 609 (Iowa 1973); *Simpson v. Davis,* 219 Kan. 584, 549 P.2d 950 (1976); *White v. Edison,* 361 So.2d 1292 (La.Ct.App.1978); 363 So.2d 915 (La.1978); *Downer v. Veilleux,* 322 A.2d 82 (Me.1974); *Brune v. Belinkoff,* 354 Mass. 102, 235 N.E.2d 793 (1968); *Naccarato v. Grob,* 384 Mich. 248, 180 N.W.2d 788 (1970); *Christy v. Saliterman,* 288 Minn. 144, 179 N.W. 2d 288 (1970); *Hart v. Steele,* 416 S.W.2d 927 (Mo.1967); *Orcutt v. Miller,* 95 Nev. 408, 595 P.2d 1191 (1979); *Carbone v. Warburton,* 11 N.J. 418, 94 A.2d 680 (1953); *Griego v. Grieco,* 90 N.M. 174, 561 P.2d 36 (1977); *Bruni v. Tatsumi,* 46 Ohio St.2d 127, 75 Ohio Ops.2d 184, 346 N.E.2d 673 (1976); *Freed v. Priore,* 247 Pa.Super. 418, 372 A.2d 895 (1977); *Moultrie v. Medical University of South Carolina,* 280 S.C. 159, 311 S.E.2d 730 (1984); *Trogun v. Fruchtman,* 58 Wis.2d 569, 207 N.W.2d 297 (1973). *Restatement (Second) of Torts,* 299A (1965); 18 A.L. R.4th 603, § 6 (1982).

idea that his pain would decrease or terminate during the remainder of Mr. Shamburger's lifetime. Testimony was presented showing that prior to the operation, Elston Shamburger had engaged in consulting work, that this work was still available to him, and that he was unable to work because of the pain resulting from Behrens' negligent care. Similarly, Signe Shamburger testified as to her loss of consortium subsequent to her husband's operation.

Where evidence is presented to support a jury instruction on future damages, an instruction should be given. *Corn Exchange Bank v. Tri–State Livestock Auction Co., Inc.,* 368 N.W.2d 596 (S.D.1985); *Northwestern Nat'l Ins. Co. v. Nemetz,* 135 Wis. 2d 245, 400 N.W.2d 33 (1986). The trial court was correct in giving this instruction.

We affirm.

WUEST, C.J., and MORGAN, J., concur.

MILLER, J., and KEAN, Circuit Judge, concur in part and dissent in part.

KEAN, Circuit Judge, for HENDERSON, J., disqualified.

KEAN, Circuit Judge (concurring in part and dissenting in part).

While I agree with the majority's position upon the issues of waiver and the national standard of care for specialists, I respectfully dissent from the position that this case should be affirmed in all other respects. I do so because I perceive in the majority opinion a failure to distinguish between the requirements to be a qualified juror and juror misconduct during deliberations.

1.

JUROR CURTIS DID NOT NECESSARILY POSSESS THE QUALIFICATIONS TO BE SEATED AS A JUROR IN THIS CASE.

The qualifications of a petit juror are generally found at SDCL 16–13–10 wherein it is stated:

QUALIFICATIONS OF JURORS. All citizens of this state, who are registered to vote, and of sound mind and who are able to read, write, and understand the English language, and not justices or clerks of the Supreme Court or a judge of the circuit court or any court of the United States, or a court of limited jurisdiction, or licensed attorneys, or clergymen as defined in § 19–13–16 when jury service conflicts with their religious beliefs and who have not been convicted of any felony unless restored to their civil rights and who are not subject to disability by the commission of any offense which by special provision of law does or shall disqualify them, are and shall be competent persons to serve on all grand and petit juries within their counties respectively. (Underlining added).

The language of this statute is broad enough to encompass an individual who has been convicted of a felony under either state or federal law as there is no limitation placed upon the wording. The phrase "... convicted of any felony ..." means convicted of a felony in South Dakota, Iowa, any other state or in federal court. And when the language of the statute is clear and no ambiguity exists, the courts should apply the clear meaning of the words used. In the *Matter of the Petition of Famous Brands,* 347 N.W.2d 882 (S.D. 1984).

In the case of *State v. Hermann,* 283 S.W.2d 617 (Mo.1955), a person convicted of a felony under a federal law remained silent during voir dire when questioned about his criminal past. Subsequent to the conviction by the jury, it was learned that this man, who was a jury member, had been convicted of a federal felony. The state argued that a federal conviction was not a disqualification under Missouri law. In holding otherwise, the Missouri Supreme Court stated:

The State further contends that a conviction in a federal court is not a disqualification. Sec. 496.100, applicable to St. Louis County, provides: "None of the following persons shall be permitted to serve as jurors: * * * (5) Any person who has been convicted of a felony". In

*State ex rel. Barrett v. Sartorious,* 351 Mo. 1237, 175 S.W.2d 787, 149 A.L.R. 1067 [1943], we held that such broad language without any stated limitation disqualified from voting one who had been convicted of a felony in a federal court. Certainly the reasons given therein are applicable here. There is even greater reason for such a conviction being a disqualification of a juror than a voter because Sec. 494.010 provides that every juror shall be "sober and intelligent, of good reputation * * * and otherwise qualified." Certainly a conviction for a felony in a federal court has some bearing on these matters.

*Id.* at p. 619.

The plaintiffs claim that Curtis's civil rights were restored to him when he was discharged from federal probation. As a basis for such claim they cite two statutes:

A <u>sentence</u> of imprisonment <u>in the state penitentiary</u> for any term suspends the right of a person so sentenced to vote, to hold public office, to become a candidate for public office and <u>to serve on a jury,</u> and forfeits all public offices and all private trusts, authority or power during the term of such imprisonment. Any person who is serving a term in any penitentiary shall be a competent witness in any action now pending or hereafter commenced in the courts of this state, and his deposition may be taken in the same manner prescribed by statute or rule relating to taking of depositions. After a suspension of sentence pursuant to § 23A–27–18, <u>upon the termination of the time of the original sentence</u> or the time extended by order of the court, <u>a defendant's rights withheld by this section are restored.</u> (Underlining added)

SDCL 23A–27–35.

Whenever any convict has been discharged under the provisions of § 24–5–1 he shall <u>at the time of his discharge be considered as restored to the full rights of citizenship.</u> At the time of the discharge of any convict under the provisions of this chapter, he shall receive from the warden a certificate and such certificate shall be due notice that he has

been restored to the full rights of a citizen. If a convict is on parole at the time he becomes eligible for discharge, the warden shall issue a like certificate, which shall be due notice that such convict has been restored to the full rights of a citizen. Any convict discharged prior to July 1, 1965 shall as of the time of his discharge, be considered as restored to the full rights of citizenship. The warden is hereby authorized to issue a certificate to such ex-convicts.

The <u>warden</u> shall mail a copy of the certificate to the <u>clerk of court for the county from which the convict was sentenced.</u> (Underlining added)

SDCL 24–5–2

Neither of these statutory provisions are applicable to the facts presented by this appeal. The first statute and the whole of SDCL 23A–27 deal with convictions and sentences issued by courts of this state. It begins by this phrase: "A sentence of imprisonment in the state penitentiary ..." which must mean the South Dakota penitentiary. The same holds true for the second statute wherein it is the warden of South Dakota's penitentiary who issues a certificate to an inmate restoring his civil rights upon discharge. It would be a bold legal proposition to hold that these two particularized statutes dealing with inmates and felons sentenced and convicted under the criminal laws of South Dakota are applicable to restore civil rights to felons convicted under other legally distinct criminal systems, herein the federal government.

The plaintiffs argue that individuals who have been convicted under a criminal system other than South Dakota's would have a more restricted right to serve on a jury. To answer this claim it should be noted that a classification restricting jury service, to non-felons is a constitutionally permitted classification. *See, e.g., Rubio v. Superior Court,* 24 Cal.3d 93, 154 Cal.Rptr. 734, 593 P.2d 595 (1979). But more importantly, South Dakota's statutes do not absolutely forbid a felon from ever serving as a juror. The right to do so is restricted until the person's civil rights are restored. It is a

qualified limitation with the burden being upon the person challenged to demonstrate his restoration to this civil status.

Thus, a person who has been convicted of a felony under federal law is excludable as a juror under SDCL 16–13–10 unless that person can demonstrate he has been restored to his civil rights. Because there was no demonstration that Curtis's civil rights had been restored under the federal system, he was potentially excludable as a juror.

### 2.

THE TRIAL COURT ERRORED BY FAILING TO GRANT THE DEFENDANT'S MOTION FOR RELIEF FROM THE JUDGMENT BASED UPON JURY MISCONDUCT.

Shortly after the Curtis letter surfaced, the defendant requested relief from the judgment. The trial court denied the motion and in doing so held (1) that there was no intrinsic or extrinsic influence by Curtis upon the jury; and, (2) there was no evidence to conclude that the jury was tampered with by Curtis.

I agree with the majority that Behren's demonstration of juror misconduct during deliberations falls short of the standard required by SDCL 19–14–7. There has been no showing that extrinsic interferences have occurred during jury deliberations. But, this appeal does not center wholly around Curtis's alleged influence upon the other jury members. The misconduct of the kind Curtis exhibited prior to trial and during jury selection is not reviewed by the standards of SDCL 19–14–7. This appeal not only involves juror misconduct during deliberation, but it also involves the issue of whether Curtis should have been allowed to participate in the decision. And it is this distinction which the majority fails to address.

The defendant's request for relief under SDCL 15–6–60(b) is well taken. In discussing this topic in *State v. Hermann, supra* at 619, the Missouri Supreme Court, after recognizing that the duty to question and preserve error on voir dire is usually the duty of counsel, noted in this exception:

> An exception is made to this rule so that 'where it is shown that matters which might establish prejudice or work a disqualification were actually gone into on voir dire, and false answers were given, or deception otherwise practiced, the court will be permitted to consider the question on the motion for a new trial, either upon oral testimony taken at a hearing on the motion, or by affidavits'; because 'the situation is closely akin to that when a new trial is sought for newly discovered evidence; and the complaining party is not to be left without a remedy for the want of a prior objection and exception, when the disqualification of the juror was one which he by due diligence could not have learned sooner. (Citations omitted)
> We find from the record herein there was such concealment and deception on the part of juror Michel as to make this exception applicable in this case; and we must hold this was prejudicial to defendant for the reasons stated in the above-cited cases. (Underlining added)

In concluding the court stated the reason implicit in this ruling is required because:

> ... [D]efendant was entitled to this information, in determining which jurors to strike in using his peremptory challenges, regardless of whether or not it amounted to an absolute disqualification. Therefore, the judgment herein must be reversed. (Underlining added)

In *McDonough Power Equipment v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), prospective jurors were questioned on the topic of injuries specifically whether any members of their immediate family had ever sustained any severe injuries or had suffered for a prolonged period of time. One juror who remained silent to this question was seated as a jury member. After the verdict it was discovered that this particular juror had failed to appropriately respond and a new trial was ordered. In reversing the order for a new trial, the Supreme Court held that under Rule 61 (the same as SDCL 15–6–61) to

obtain a new trial a party (1) must first demonstrate that a prospective juror failed to answer honestly a material question on voir dire; and (2) then show that a correct response would have provided a valid basis for a challenge for cause.

The defendant's motion for a new trial meets the criteria of *Greenwood.* First, Curtis failed to answer a material question. His prior conviction of mail fraud, a crime of dishonesty, had a direct bearing upon his qualifications as a juror. Under our state procedure it makes no difference whether the question was answered by questionnaire or by way of answer in voir dire. A dishonest answer to a material question under either circumstances is adequate. *See, State v. Delfs, supra; State v. Wyss,* 124 Wis.2d 681, 370 N.W.2d 745 (1985). Was Curtis dishonest in his failure to fill out the jury form? The top of the form required him to read and fill out both sides. He did not fill out the reverse side. He failed to use his true name. He failed to mention other litigation in Pennington County. He failed to mention his conviction for mail fraud. He attempted to extort money from the prevailing attorney. Curtis's honesty falls short of the benchmark.

Next, if the true state of affairs were known, the defendant would have had a challenge for cause. Under SDCL 15–14–6(1) a juror may be challenged for cause because he does not qualify. As Curtis was potentially not qualified because of his felony conviction under federal law, he could have been challenged. It is not required in *Greenwood* that the court be convinced that a challenge would have been exercised. It is only required that the challenge for cause exist.

I would reverse the trial court's ruling and remand the proceedings to the lower court for a new trial.

I am authorized to state that MILLER, J., joins in concurring in part and dissenting in part.