#24726-a-DG

2009 SD 83

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

SHARON RUSSO, individually and as
Special Administratrix of the Estate
of NATASHA PENDERGRASS, and
JESSICA RUSSO,                                        Plaintiffs and Appellees,

   v.

TAKATA CORPORATION and
TK HOLDINGS, INC.,                                   Defendants and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JANINE KERN
Judge
* * * *

PETER KING
KEVIN KING of
Cline, King and King, P.C.
Columbus, Indiana

and

GEORGE J. NELSON of
Abourezk Law Firm, P.C.
Rapid City, South Dakota                             Attorneys for plaintiffs
                                                     and appellees.

* * * *

ARGUED MARCH 24, 2009

OPINION FILED 09/16/09

WAYNE D. STRUBLE
DAVID R. KELLY of
Bowman & Brooke, LLP
Minneapolis, Minnesota

and

PATRICIA A. MEYERS of
Costello, Porter, Hill,
  Heisterkamp, Bushnell & Carpenter, LLP
Rapid City, South Dakota

Attorneys for defendants
and appellants.

#24726

GILBERTSON, Chief Justice

[¶1.] In this wrongful death action, a juror performed a Google search after receiving a juror summons but before voir dire and being seated on the jury. During deliberations the juror's Google search was made known to five other jurors. The jury returned a defense verdict. Plaintiffs filed a motion for new trial claiming juror misconduct and extrinsic information was revealed to the jury during a critical stage of the deliberations. The motion was granted, the verdict was vacated, and an order for new trial was entered. Defendants Takata and TK Holdings appeal. Finding no abuse of discretion, we affirm.

## FACTS

[¶2.] On April 15, 1999, Natasha Pendergrass (Natasha), age sixteen at the time, was driving her mother's 1996 Geo Tracker to school with her then ten-year-old sister Jessica Russo (Jessica). While traveling on Highway 385 near Hill City, South Dakota, the vehicle crossed the centerline, traveled back into its lane of traffic, slid sideways off of the shoulder of the road, and rolled almost three times down a steep ravine before hitting a tree. Natasha was thrown across the front seat, partially ejected from the vehicle, and pinned under the Tracker. She briefly survived but died at the scene. Jessica was thrown into the back seat but was not physically injured in the crash.

[¶3.] Sharon Russo, individually and as administratrix of Natasha's estate, and Jessica (Plaintiffs) filed suit against General Motors Corporation, Suzuki Motor Corporation, and the seatbelt and buckle manufacturer Takata Corporation and its American subsidiary, TK Holdings, Inc., (collectively "Takata"). Plaintiffs alleged

-1-

Natasha and Jessica buckled their seatbelts before the crash but that the seatbelts simultaneously unlatched due to inertial forces acting on the buckles during the rollover. General Motors Corporation and Suzuki Motor Corporation settled their respective claims before trial.

[¶4.] Takata, the manufacturer of the model TK-52 seatbelts installed in Russo's Geo Tracker, denied Plaintiffs' claims. Takata proceeded to trial under the theory that the girls did not buckle their seatbelts before the crash, and that Natasha failed to maintain control over the vehicle. Takata also denied that simultaneous inertial unlatching of the model TK-52 seatbelts was possible in real world accidents.

[¶5.] Plaintiffs brought separate claims for negligent design on behalf of Natasha's estate and on behalf of Jessica. Plaintiffs also brought claims for strict liability.

[¶6.] On May 4, 2007, Shawn Flynn (Flynn) and other prospective jurors received a summons and a questionnaire. The summons stated in part: "Do not seek out evidence regarding this case and do not discuss the case or this Questionnaire with anyone." The questionnaire did not ask prospective jurors whether they knew anything about Takata or other lawsuits against it. It also did not ask if jurors had performed any internet searches or other investigation related to the case.

[¶7.] Upon receiving his jury summons, Flynn did not recognize Takata by name or product line and wondered "what they did." He conducted two Google searches on his home computer. His first search term of "Takata" returned its home

page that revealed it "was a seat belt and airbag manufacturer." The second search term "TK Holdings" revealed it "was the American subsidiary of Takata."

[¶8.] On July 16, 2007, almost two months after the questionnaires were received and Flynn conducted his internet searches, jury selection began. Jurors were asked during voir dire to "make a mental note of the answers that you would have made had you been asked the questions posed by counsel." Plaintiffs' counsel questioned the panel extensively about their knowledge of the Plaintiffs, whether they were acquainted with the family, and how. Panel members who claimed knowledge or past relationships with the family or their witnesses were asked whether that prior knowledge would affect the panel member's ability to be impartial or listen to the evidence.

[¶9.] Plaintiffs' counsel asked Flynn during voir dire whether any questions posed to other prospective jurors caused him to want to disclose anything. This question was posed before counsel for Takata had asked any questions, any information specific to Takata had been discussed, or questions specific to Takata had been posed. Flynn answered in the negative.

[¶10.] Takata also questioned the panel extensively about past and current relationships with and knowledge of Sharon Russo, Natasha, and Jessica. The only question asked specific to Takata and any prior knowledge panel members might already possess was posed by counsel for Takata: "Okay. Before you got here this morning had anyone ever heard of Takata?" No one, including Flynn responded positively to the inquiry. After concluding Flynn's brief questioning with this general question posed to him and to all prospective jurors, Takata's counsel

immediately asked a question of another panel member as to whether he had ever taken apart a car seatbelt or other car component.

[¶11.]     After Flynn's voir dire questions had been asked and answered, Takata's counsel asked whether it would surprise anyone that people other than Sharon Russo had claimed that a Takata seatbelt had malfunctioned in a crash. Takata's counsel also asked if jurors would wait until hearing all evidence by both sides on other malfunctions claims before deciding that the Takata seatbelts in the Russo Geo Tracker were defective.  Finally, Takata's counsel asked if anyone thought that evidence of other seatbelt malfunction claims automatically meant that the seatbelt in this case was defective.  None of the panel members replied in a manner that indicated evidence of other claims would cause the juror to conclude before all evidence was presented that the seatbelt in this case was defective.

[¶12.]     The last question posed by counsel for Takata was if there was "anything that we haven't asked you about that you think was important for us to know or important for the [P]laintiffs to know about you and the way that you're approaching your job potentially as a juror in this case that we haven't talked about already?  Anything at all?"  Again, no one answered in the affirmative.

[¶13.]     The trial court then excused all but the twenty-two panel members from which the jury would be chosen.  Each side exercised its peremptory challenges.  Flynn was named as a jury member and sworn in.  Flynn testified during the hearing on the jury misconduct that he did not conduct any additional Google searches on Takata after being sworn in.

[¶14.]     Takata filed a motion in limine seeking to exclude or limit evidence on alleged prior seatbelt failures. The trial court determined that such evidence was "relevant solely to the issue of notice regarding the alleged defect" and irrelevant to whether a defect actually existed in the seatbelt involved in this case. It then limited the evidence of prior alleged accidents, claims, and lawsuits to the issue of notice.

[¶15.]     Trial lasted nineteen days. Plaintiffs presented evidence that four other Geo Tracker drivers or passengers had experienced seatbelt failures in the past. Some of these witnesses did not press claims against Takata as a result of the alleged seatbelt failures and injuries. Some of the witnesses were uncertain whether their seatbelt was manufactured by Takata, or whether notification given to General Motors was passed on to Takata. Evidence was also presented to the jury that ten other lawsuits had been filed against Takata alleging seatbelt malfunctions. Some of these seatbelt malfunctions were not related to the TK-52. The jury was instructed that evidence of other lawsuits and complaints was "only for the purpose of establishing whether Takata had notice of the alleged defect."

[¶16.]     On August 1, 2007, the case was given to the jury. An exchange between Flynn and another juror, Jack Schock (Schock), occurred approximately four and one half to five hours into the deliberations. At that time, the jury was discussing the case in small splinter groups. The discussion was about whether Takata had notice of any defects as it related to the product manufactured by Takata.

[¶17.]     Flynn was looking at another juror, Kent Hersey, who asked out loud whether Takata had ever been sued. Flynn responded that he had done a Google search and had learned that Takata manufactured seatbelts and airbags but did not find any lawsuits during his search. Juror Schock told Flynn in a loud and stern voice that jurors were not to take into consideration outside information. Flynn tried to retract what he had said. At that point, jury foreman Michael McMeekin's (McMeekin) attention was drawn to the exchange and the matter was dropped. Three jurors heard the exchange and were aware of what Flynn said: Hersey, Schock, and Adam Holzer (Holzer). The entire exchange lasted approximately three to five minutes. Schock did not ask McMeekin to do anything about the comments, and no report was made to the trial court concerning Flynn's remarks.

[¶18.]     After the disclosure of Flynn's Google search, the jury deliberated for approximately another one and one-half hours before reaching a verdict. The jury returned a verdict for Takata on both Natasha and Jessica's claims. Juror Holzer was the lone juror who did not agree with the defense verdict and who voted in favor of the Plaintiffs.

[¶19.]     Nineteen days later, Plaintiffs filed a Motion for New Trial alleging juror misconduct. Affidavits from ten jurors were filed with the motion. Schock and Holzer stated in their affidavits that they believed other jurors heard the exchange between Flynn and Schock. Six jurors including McMeekin, Flynn, Angelique Collins, Michael Ogren (Ogren), Kelli Wold and Angie Walter, swore that the jury did not discuss Flynn's remark or his Google search. Collins stated that she heard a remark by Flynn during deliberations that he had done a Google search on Takata.

Juror Ogren's affidavit stated he remembered Flynn telling other jurors he had done a Google search of Takata prior to the start of deliberations. Jurors Gail Dedic and Joni Peterson stated in their affidavits that they did not remember any such remarks by anyone. Juror Walter stated she recalled hearing someone say "you can't do that," and asking about the comment. She remembered being told that someone had "looked up Takata," but nothing further. None of the jurors who submitted affidavits claimed the jury discussed the Google search or Flynn's remark that he had found no lawsuits during his searches.

[¶20.] On September 12, 2007, the trial court held a hearing on the matter in which the affidavits were submitted. McMeekin and Flynn were called to testify by Takata. Plaintiffs did not call any witnesses.

[¶21.] The trial court entered oral findings of fact and conclusions of law from the bench at the conclusion of the evidence. The oral findings of fact and conclusions of law were reduced to writing and signed by the trial court on October 18, 2007. The trial court found that Flynn obtained information about Takata before being summoned for jury duty by performing a Google search and finding each company's internet home page. It further found that Flynn's explanation was that he was uncertain as to the company's identities or what type of activities it performed; Flynn learned as a result of the searches that Takata was a manufacturer of seatbelts and air bags. It also found that Flynn did not notify counsel or the trial court during voir dire of his searches during voir dire. The trial court found that Flynn's testimony about the depth and extent of his Google searches to be less than credible. It found that Flynn's testimony implied that he

had done a more detailed search than the one he acknowledged. It did so based on Flynn's comment that he did not see any evidence of other lawsuits during his searches. The trial court found that Flynn's actions and comments were in violation of his oath, the court's admonishments, and the jury instructions. It also found the information provided by Flynn was inconsistent with the evidence introduced at trial and was provided at a time during the deliberations that was crucial to Plaintiffs' case.

[¶22.]    The trial court used the Eighth Circuit Court of Appeals' objective test from *United States v. Swinton*, 75 F3d 374, 382 (8thCir 1996), to determine the relevant considerations for ascertaining whether extraneous information had an influence upon a typical juror. The factors used by the trial court from that test were:

> (1)    whether the extrinsic evidence was received by the jury and the manner in which it was received;
> (2)    whether it was available to the jury for a lengthy period of time;
> (3)    whether it was discussed and considered extensively by the jury;
> (4)    whether it was introduced before a verdict was reached and if so at what point during the deliberations it was introduced; and
> (5)    whether it was reasonably likely to affect the verdict, considering the strength of the [Plaintiffs'] case and whether it outweighed any possible prejudice caused by the extrinsic evidence.

[¶23.]    It then concluded that Flynn's comments constituted outside information brought into the jury's deliberations that was extrinsic, extraneous, and not intrinsic. The trial court further concluded that Flynn's comments were introduced at a critical phase of the jury deliberations in violation of South Dakota

law. It concluded the introduction of the information created a rebuttable presumption of prejudice to Plaintiffs that was not rebutted by Takata. In the alternative the trial court found that even without a rebuttable presumption, the introduction of the information into the jurors' deliberations had a tendency to influence the jury in a manner inconsistent with the evidence presented at trial and the instructions of the trial court. It also concluded that there was a reasonable probability that Flynn's remarks, that there were no other lawsuits against Takata, impacted the jurors' decision as to whether or not the product was defective and whether Takata had notice of any defects. Finally, the trial court vacated the jury's verdict and entered an order for new trial.

[¶24.]    Takata raises three issues on appeal:

1.    Does a remark made by a juror during deliberations based on information that the juror knew before jury selection and that could have been ascertained by reasonable voir dire constitute "extraneous information" upon which a trial court can set aside a verdict under SDCL 19-14-7?

2.    Whether a rebuttable presumption of prejudice is created in a civil trial when extraneous information is brought to the jury's attention.

3.    Whether a juror's remarks prejudiced the jury's verdicts against the Plaintiffs.

## STANDARD OF REVIEW

[¶25.]    This Court reviews a trial court's factual determinations regarding juror misconduct under the clearly erroneous standard. State v. Wilkins, 536 NW2d 97, 99 (SD 1995) (citing Shamburger v. Behrens, 418 NW2d 299, 303 (SD 1988)). "A finding is 'clearly erroneous' when after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake was made." Id. (quoting State v.

*Almond,* 511 NW2d 572, 574 (SD 1994)) (additional citations omitted). The trial court's findings of fact are reviewed in a light most favorable to those finding. *Id.*

[¶26.] The manner in which the trial court applied the law to its findings of fact is reviewed under the abuse of discretion standard. *Id.* (citing *Shamburger,* 418 NW2d at 303). "'[A]n abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'" *Id.* (quoting *Almond,* 511 NW2d at 572) (additional citations omitted).

ANALYSIS AND DECISION

[¶27.] 1. **Does a remark made by a juror during deliberations, based on information that the juror knew before jury selection and that could have been ascertained by reasonable voir dire, constitute "extraneous information" upon which a trial court can set aside a verdict under SDCL 19-14-7?**

[¶28.] Inquiry into jury deliberations for purposes of impeaching a verdict is limited by the provisions of SDCL 19-14-7:

> Except as otherwise provided by statute, upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

The statutory language limits the type of information that a juror may be asked to provide via an affidavit or under oath at a hearing on a motion for new trial. *Wilkins,* 536 NW2d at 99. The prohibition on admitting testimony and affidavits

pertains to intrinsic information, which includes "statements or discussions which took place during deliberations." *Id.* (citing Buchholz v. State, 366 NW2d 834, 838 (SD 1985)). Testimony and affidavits concerning extrinsic information, however, may be obtained from a juror. *Id.* (citing *Buchholz*, 366 NW2d at 838).

[¶29.] Extrinsic information includes "media publicity, conversations between jurors and non-jurors, and evidence not admitted by the court." *Id.* (citing *Buchholz*, 366 NW2d at 838). Extrinsic information also includes "knowledge relevant to the facts in issue not obtained through the introduction of evidence but acquired prior to trial, experiments, investigations, news media, etc." *Shamburger*, 418 NW2d at 303 (citing 3 Weinstein's Evidence ¶606[03], [04]). "[T]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings and bias that every juror carries into the jury room." Morgan v. Woessner, 975 F2d 629, 645 (9thCir 1992) (quoting Hard v. Burlington N. R.R. Co., 870 F2d 1454, 1461 (9thCir 1989)).

[¶30.] We have not had occasion to review the meaning of general versus specific knowledge in the context of whether it constitutes intrinsic versus extrinsic information. Other jurisdictions that have reviewed these issues have focused on the policies underlying Federal Rule of Evidence Rule 606(b) for guidance. Wright & Miller, 27 Fed. Prac. & Proc. Evid. 2d § 6075 (2009) (citing Susan Crump, *Jury Misconduct, Jury Interviews, and the Federal Rules of Evidence: Is the Broad Exclusionary Principle of Rule 606(b) Justified?,* 66 NCL Rev 509, 540 (1988)). Reliance on the policies underlying Rule 606(b) has occurred because of vague and unworkable standards in defining general versus specific knowledge. *Id.* The

underlying policies that must be balanced against each other are the need for finality versus the need for an acceptable level of fairness and accuracy. *Id.* The end result is that general knowledge is that which is gained as a consequence of a juror's life experiences, while specific knowledge is either that which is factual or legal in nature and obtained *due to jury service on a specific trial from sources other than the evidence admitted at trial. Id.* As was noted in *United States v. McKinney*, 429 F2d 1019, 1022-23 (5thCir 1970):

> All must recognize, of course, that a complete sanitizing of the jury room is impossible. We cannot expunge from jury deliberations the subjective opinions of jurors, their additudinal expositions, or their philosophies. These involve the very human elements that constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations. Nevertheless, while the jury may leaven its deliberations with its wisdom and experience, in doing so *it must not bring extra facts into the jury room.* In every criminal case we must endeavor to see that jurors do not [consider] in the confines of the jury room . . . specific facts about the specific defendant then on trial. . . . To the greatest extent possible all factual [material] must pass through the judicial sieve, where the fundamental guarantees of procedural law protect the rights of those accused of crime.

(Emphasis added.) The prohibition on extrinsic information is focused on extra facts that were not subjected to adversarial challenge during trial and that were relevant to issues in dispute. United States v. Stewart, 433 F3d 273, 307 (2ndCir 2006) (holding evidence admitted against one defendant and for which a limiting instruction was given that the evidence should not be considered against the second defendant, but which was subjected to adversarial testing was not extraneous even if considered against the second defendant because the evidence was inside the record and not obtained from a source outside the courtroom).

[¶31.] Takata argues that the information Flynn obtained during his Google searches was not extrinsic within the meaning of SDCL 19-14-7 because it was obtained before trial and was discoverable through voir dire. Defendants argue that the information obtained by Flynn was general knowledge rather than specific knowledge. As such, Takata argues it should have been explored during voir dire.

[¶32.] Takata's argument that Plaintiffs could have asked more probing questions and discovered Flynn's prior knowledge is accurate. Takata's argument, however, misses the mark in that Flynn obtained the information, that no lawsuits were listed on Takata's home page, after receiving his jury summons and that the fact was specific to the defendant and relevant to evidence that was admitted at trial for a limited purpose under a carefully crafted order. The information Flynn disclosed to five members was not subject to adversarial testing. It pertained to the issue of knowledge of a defect with the TK-52 seatbelt, an issue hotly contested between the parties, and it directly contradicted the evidence admitted at trial under the trial court's limiting order. This was not information that Flynn obtained in passing from media outlets prior to his awareness that a suit against Defendants was pending in Pennington County. *See State v. Luna*, 378 NW2d 229, 236 (SD 1985) (holding jurors' pretrial bias formed by media coverage and absorbed before the jurors were impaneled cannot form the basis for attacking a verdict under SDCL 19-14-7) (citing State v. Finney*, 337 NW2d 167 (SD 1983)). This also was not knowledge or information obtained in the course of Flynn's employment or due to the manner in which he had experienced life. Flynn sought out the information specifically in response to the receipt of the summons in which the names of the

Defendants were first made known to him.* Thus, we conclude that the information was not obtained through the introduction of evidence but "elsewhere," in response to Flynn's service as a juror, and was, therefore, extrinsic in nature.

[¶33.]     Our inquiry, however, does not end there. We must determine whether the information obtained "elsewhere" by Flynn was relevant to the facts in issue. Plaintiffs had to plead and prove that the seatbelts were defective. We must determine whether the information Flynn saw, or in this case did not see on Takata's websites that no lawsuits against Takata or TK Holdings were listed on their home pages, was relevant to that issue.

[¶34.]     Evidence was presented at trial that four individuals who were driving Geo Trackers equipped with Takata seatbelts sustained injury as a result of rollover

---

*       The jury summons received by Flynn stated specifically: "Do not seek out evidence regarding this case and do not discuss the case or the Questionnaire with anyone." It may well be that Flynn did not realize that performing a Google search on the names of the Defendants Takata and TK Holdings constituted "seek[ing] out evidence." Flynn was not in a position to know whether the existence of other suits against Takata would be an issue at trial because he was not a lawyer, had no experience with products liability litigation, and had little familiarity with the jury process at the time he received his summons. The information that Flynn obtained became factually relevant to the issue of whether Defendants had knowledge of the alleged defect in the seatbelt and as such it was evidence "that tend[ed] to prove or disprove the existence of an alleged fact," *See* Black's Law Dictionary (8th ed 2004). We suggest circuit courts consider using simpler and more direct language in the summons to indicate that no *information* about the case or the parties should be sought out by any means, including via computer searches. This type of admonishment is warranted given the ease with which anyone can obtain information via the internet, and that such information may or may not be accurate. The potential for inaccuracies and its wide availability also support voir dire questions designed to identify any jurors who may have accessed information about the parties on the internet.

(continued . . .)

accidents. None of the individuals who testified live provided notice to Takata of the alleged defects. At least one testified that notice was given to General Motors. Evidence via a videotaped deposition by a Takata executive was admitted at trial that ten lawsuits were filed against Takata prior to this suit alleging defective seatbelts had caused injury. Flynn's comment was that no lawsuits were listed on Takata's home pages. He did not assert the position that no such lawsuits existed. While the non-existence of a listing of lawsuits on a company's homepage is not the same as definitive evidence that such suits do not exist, that proposition, however, could have been inferred from Flynn's remarks.

[¶35.]	The trial court's conclusion of law that the information was extrinsic and not intrinsic also includes a finding of relevancy by implication. We find no error in the trial court's conclusion that the information obtained by Flynn was extrinsic within the meaning of SDCL 19-14-7. We also find no error in its finding that the extrinsic information was relevant to the facts at issue in the trial.

[¶36.]	**2.	Whether a rebuttable presumption of prejudice is created in a civil trial when extraneous information is brought to the jury's attention.**

[¶37.]	The trial court concluded as a matter of law that introduction of extraneous information into the jury deliberation process raised a presumption of prejudice. It did so by relying on language in *Bland v. Davison*, 1997 SD 92, ¶17, 566 NW2d 452, 458, in which this Court quoted from *Wilkins*, 536 NW2d at 99-100: "when juror misconduct occurs, a rebuttable presumption of prejudice arises. The state may rebut this presumption." Our case law is clear that in a criminal

_____

(. . . continued)

prosecution a rebuttable presumption of prejudice arises when extraneous information is introduced into jury deliberations. *Wilkins*, 536 NW2d at 99-100; *Buchholz*, 366 NW2d at 840.

[¶38.]    The issue of who bears the burden of showing prejudice, however, is not so clear from the few civil cases that have come before this Court. In *Shamburger* we noted that "[a] party seeking a new trial on the grounds of juror misconduct must demonstrate that the misconduct materially affected his or her substantial rights." 418 NW2d at 302 (citing Carpenter v. Union Baking Co., 67 SD 151, 290 NW2d 322 (1940)). In *Bland* we also quoted and cited several criminal cases, including *Wilkins*, to supplement our sparse case law in this area. *See* 566 NW2d at 457. Our citation to *Wilkins* included a quote regarding the rebuttable presumption of prejudice in the context of a criminal case. *Id.*

[¶39.]    Any confusion we may have created in *Shamburger*, however, should have been laid to rest in *Buisker v. Thuringer*, 2002 SD 81, 648 NW2d 817. In that case, we noted that extrinsic evidence and a recognized ground to overturn the verdict is not enough to justify overturning a jury's verdict. *Id.* ¶15, 648 NW2d at 822. The party seeking to overturn the verdict must also show it was prejudiced by the jury misconduct. *Id.* "The test is whether the extraneous matter had a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the evidence and the instructions of the court." *Id.* (citing Panko v. Flintkote Co., 7 NJ 55, 80 A2d 302 (1951)).

[¶40.]    The trial court in the case at bar also applied the *Buisker* test in addition to the criminal presumption from *Wilkins* as quoted in *Shamburger*. To

the extent that our writing in *Shamburger* caused any confusion with regard to the proper test for prejudice in a civil case in which jury misconduct and the introduction of extrinsic evidence are alleged, it is overruled. The proper test is contained in *Buisker*, and the burden of persuasion as to prejudice is on the party seeking a new trial. The trial court's application of the *Buisker* analysis for determining prejudice from the introduction of extrinsic information into jury deliberations in a civil action was not in error.

[¶41.]    3.    **Whether a juror's remarks prejudiced the jury's verdicts against the Plaintiffs.**

[¶42.]    The trial court concluded as a matter of law that Flynn's extrinsic information prejudiced the jury's verdict. It did so by concluding that the information was presented to jurors at a critical juncture during deliberations and that it had a tendency to influence the jury in a manner inconsistent with the evidence and the instructions of the trial court. The trial court also concluded that there was "a reasonable probability that Juror Flynn's information, that there were no other lawsuits against Defendants, impacted the jurors' decision as to whether or not the product was defective and further, whether Takata had notice of any defects in the product."

[¶43.]    Extrinsic information that goes beyond the mental processes of one juror and becomes known to other jurors can prejudice a jury verdict and affect the substantial rights of the party seeking a new trial. *Cf. Shamburger*, 418 NW2d at 304. Extrinsic information that is presented to the jury after the jury has already reached a verdict, however, cannot materially affect the moving party's substantial rights. *Bland*, 1997 SD 92, ¶16, 566 NW2d at 457 (citing *Shamburger*, 418 NW2d

at 302). Our standard requires a showing that "a typical reasonable, or normal juror could have been influenced by the facts presented." *Wilkins*, 536 NW2d at 100. We do not require that there be proof in the record that a juror's improper conduct had an effect on the verdict, as a trial court is precluded from inquiring into the subjective effect of extrinsic material upon a juror. *Id*. The trial court can, however, question jurors to determine whether the extrinsic information had no effect upon them. *Id*.

[¶44.] In the instant case, at least four jurors, including Flynn, were involved in the conversation in which Flynn revealed his Google search or heard the comment first-hand at the time Flynn spoke. At least two other jurors were aware that a Google search had been conducted by Flynn but may not have heard the exchange first-hand at the time the words were spoken.

[¶45.] The extrinsic information went beyond Flynn's mental processes. All jurors agreed that the jury did not discuss the Google search as a panel during deliberations. However, our case law does not require that the entire jury be exposed to extrinsic information in order to proceed to determine whether there was prejudicial effect. While it may not have been discussed by the jury as a whole, at least six jurors were aware that the search had been done and that no lawsuits were seen by Flynn on Takata's.

[¶46.] These six jurors deliberated for an additional ninety minutes with that knowledge at their disposal. While the discussion itself may have only taken three to five minutes, any effect the extrinsic information had likely continued throughout the remaining deliberations. Thus, we conclude that prejudice was possible given

that the information went well beyond Flynn's mental processes and was available for recall to those jurors for ninety minutes of the deliberations.

[¶47.] Takata argues on appeal that the verdict on Natasha's claims had already been put to a vote and the jury found that her seatbelt was not defective. This was not included as a finding of fact by the trial court. There was testimony in the record, however, from Flynn and McMeekin that the jury had already reached a verdict regarding Natasha's claim.

[¶48.] Plaintiffs argue that the jury verdict form had not been signed at the time Flynn made his remarks. They further argue that the jury could have changed its vote and verdict at any time before signing the form. Thus, they conclude the jury had yet to reach a verdict at the time in question.

[¶49.] The verdict form was structured for the jury to consider Natasha's negligent design claim first, followed by Jessica's negligent design claim. Following those two claims, the verdict form addressed the strict liability claim of both Natasha and Jessica as one claim. While Flynn and McMeekin may have thought the jury was done considering all of Natasha's claims at the time the remark was made, there is nothing in the record to suggest that the strict liability claim had been decided before Flynn's remarks. This claim pertained to both Natasha and Jessica's seatbelts.

[¶50.] The trial court was in the best position to determine which claims had been dealt with and which ones remained to be discussed by the jury at the time of Flynn's comments. It concluded that the issue of whether the seatbelts were defective and whether Takata had notice was still in play at the time Flynn

revealed his internet searches to members of the jury. We can find no abuse of discretion in its determination that the information was revealed at a time crucial to Plaintiffs' case given that the strict liability claim may not have been discussed yet and pertained to both Natasha and Jessica.

[¶51.]     We next examine whether "a typical reasonable, or normal juror could have been influenced" by Flynn's remarks while deliberating the Plaintiffs' claims. There was evidence presented at trial regarding whether Takata had notice that its seatbelts were defective. The cases of four other drivers who claimed Takata seatbelts had come unbuckled during accidents were presented to the jury during the trial, as well as the fact that ten other lawsuits had been filed against Takata. The trial court provided a limiting instruction prior to the introduction of the evidence and again when it instructed the jury. That limiting instruction stated:

> Sometimes a party presents evidence which you may consider for one purpose but not for another. In this case plaintiff will present evidence of customer claims regarding seatbelts. Plaintiff is presenting this evidence to prove that Takata had prior notice of the defect alleged in this case. You may consider this evidence only for the purpose of establishing whether Takata had notice of the alleged defect.

Flynn's remarks were inconsistent with the evidence presented at trial that there were prior claims made alleging that Takata seatbelts were defective and that Takata knew about those claims.

[¶52.]     A typical, reasonable, or normal juror could have been influenced by Flynn's remark given that it directly contradicted evidence admitted at trial. While Flynn was not himself an authoritative source, Takata's home page might have

been considered by other juror members exposed to Flynn's remarks as somewhat authoritative on the issue.

[¶53.]    In *Buisker*, the jury was exposed to information obtained by a juror from a highway patrolman who was married to the bailiff on the trial. 2002 SD 81, ¶6, 648 NW2d at 819. The highway patrolman told the juror that the defendant in that case had liability insurance and that the purpose of the lawsuit was to enforce a judgment against the insurer. *Id.* The evidence of liability insurance had been precluded from admission at trial by the provisions of SDCL 19-12-13. *Id.* ¶14. The existence of liability insurance appeared to cause the jury to believe the parties were "in cahoots" in order to obtain a recovery. *Id.* ¶16. This Court held on appeal that "it was this outside information, from what may have seemed to be an authoritative source, that tended to influence the jurors in deciding in a manner inconsistent with the instructions if not the evidence as well." *Id.*

[¶54.]    Similarly in this case, the jurors may have considered the somewhat authoritative source of Flynn's information as giving greater information concerning the existence or non-existence of other claims against Takata. The issue of other claims was hotly contested by the parties, and admitted under a carefully crafted limiting instruction. This information may have caused at least six of the jurors to decide in a manner inconsistent with the instructions given by the trial court if not the evidence as well.

[¶55.]    Admittedly this is a close case. Today we announce no hard and fast rule that all such types of internet research by a juror prior to trial without notice to the court and counsel automatically doom a jury's verdict. Rather, as we do in such

close cases, we give deference to the trial court, which had the distinct advantage of being present throughout the nineteen-day trial. The trial court was in the best position to determine whether material was extrinsic to the issues before the jury, or whether the extraneous material prejudiced the jury. Based on the cold record before us, we cannot say that the trial court's finding that Juror Flynn lacked credibility is clearly erroneous or that its award of a new trial rises to the level of an abuse of discretion. The trial court is affirmed.

[¶56.]        KONENKAMP, ZINTER, and MEIERHENRY, Justices, and SABERS, Retired Justice, concur.