#30783-a-SRJ
**2025 S.D. 33**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

CALVIN BERWALD, d/b/a
SOKOTA DAIRY,                                              Plaintiff and Appellant,

v.

STAN'S, INC.,                                              Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
JERAULD COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE KENT A. SHELTON
Judge

\* \* \* \*

SEAMUS W. CULHANE of
Turbak Law Office, P.C.
Watertown, South Dakota                          Attorneys for plaintiff and
                                                 appellant.


RICHARD J. RYLANCE, II
Micayla S. Bamberg of
Morgan Theeler, LLP
Mitchell, South Dakota

SCOTT A. HINDMAN of
Mayne, Hindman, Frey, Parry
    & Wingert
Sioux City, Iowa                                 Attorneys for defendant and
                                                 appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
APRIL 28, 2025
OPINION FILED **07/09/25**

JENSEN, Chief Justice

[¶1.]        Calvin Berwald operated a dairy farm as Sokota Dairy, near Alpena, South Dakota. He filed this action alleging that Stan's, Inc. (Stan's), a local feed mill, breached an agreement for Berwald to purchase soybean meal by prematurely cancelling it. Berwald also alleged that Stan's breached the implied warranties of merchantability and fitness for a particular purpose arising from his separate purchase of calf starter, claiming that contaminated calf starter caused the death of more than 200 of his cattle. The circuit court granted Stan's motion for summary judgment on the breach of contract claim based upon accord and satisfaction. Following trial, a jury found that Stan's breached the warranty of fitness for a particular purpose but that no damages were caused by the breach. Berwald appeals, arguing the circuit court erred in granting summary judgment on the breach of contract claim and in denying his motion for a new trial.

**Factual and Procedural History**

[¶2.]        In January 2012, Berwald contracted with Stan's to purchase 400 tons of soybean meal at $319 per ton for delivery between February 1 and September 30 of that year (the commodity contract). Soybean meal was a primary component of the feed mixtures Berwald used to feed his dairy herd. Berwald would periodically order a custom dry feed composed of the purchased soybean meal mixed with other ingredients from Stan's.

[¶3.]        In April 2012, Berwald purchased a customized calf starter mixture from Stan's. On the morning of May 3, three of Berwald's calves were found dead. Berwald contacted Dr. Hubbert, a veterinarian, to investigate the death of the

calves. Dr. Hubbert conducted an autopsy on one of the calves and observed evidence of possible monensin toxicity.[1] Dr. Hubbert instructed Berwald to send the remains of the two other calves and a sample of the feed to the animal science department at South Dakota State University for further investigation.

[¶4.] On June 7, Mike Kopfmann, the general manager at Stan's, called Berwald to inform him that the company would be buying back the commodity contract due to late payments on the purchased soybean meal. The written commodity contract did not include any payment terms. Kopfmann testified that Berwald initially had a credit line with Stan's, but claimed there were multiple instances of "slow pay" that required Stan's to hold Berwald's checks for several days until his account had sufficient funds for the checks to clear. Kopfmann explained that Stan's gave Berwald the opportunity to continue under the commodity contract if he started paying in cash upon delivery of the soybean meal. When Berwald failed to meet this condition, Stan's made the decision to cancel the contract. Kopfmann also testified that when he spoke with Berwald about this decision, Berwald communicated, for the first time, his belief that Stan's calf starter was killing his calves.

[¶5.] On June 11, Stan's sent a letter to Berwald notifying him that it would be cancelling the commodity contract on June 15 due to "insufficient credit performance." Because the price of soybean meal had increased since January,

---

1. Throughout the record and transcripts, monensin is referred to under its brand name, Rumensin. Monensin is an ionophore antibiotic used to promote growth and prevent disease but excessive amounts from accidental contamination or mixing errors in feed can be fatal to cattle.

Stan's offered to buy out the contract by paying the difference between the contracted price and the increased price reflected on the Chicago Board of Trade (CBOT). The letter explained that the undelivered balance of 274.56 tons would be priced based on the CBOT July soybean meal futures price, less $45 per ton.[2] These proceeds would be applied to the $5,982.75 Berwald owed on accounts receivable, and a payment would be issued to Berwald for the remaining amount.

[¶6.]     Berwald responded in a letter sent by his attorney on June 14, expressing Berwald's concern that cancelling the commodity contact would result in significant losses to him. The letter indicated that Berwald believed he was up to date on his payments to Stan's and that he had not received a bill for the $5,982.75 referred to in the June 11 letter. Berwald disputed that his payment history showed any type of insufficient credit performance and requested that Stan's refrain from canceling the commodity contract until the parties had a chance to discuss these issues. The letter also requested a copy of the commodity contract and clarification on the credit requirements Berwald allegedly failed to meet.

[¶7.]     The following day, Stan's cancelled the commodity contract with Berwald and sold the corresponding futures contract for the remaining 275.56 tons at the close of trading on the CBOT. On June 18, Stan's sent Berwald a letter confirming the cancellation. The letter included Stan's calculation of the payment due Berwald and a check payable to Sokota Dairy for that amount. Stan's calculation began with the July soybean meal futures price of $411 per ton,

---

2.     Stan's June 18 letter explained that the $45 reduction was the "local basis" reduction. The "local basis" is the difference between the local cash price for the commodity on a certain date and the CBOT futures price.

subtracted the $45 local basis to arrive at $366, and then compared that figure with the January contract price of $319 per ton. The $47 per ton difference was multiplied by the remaining 274.56 tons of undelivered soybean meal, for a total of $12,904.32. Stan's then applied these proceeds towards the $5,982.75 it claimed Berwald owed for delivered soybean meal, leaving an excess of $6,921.57 due to Berwald. The letter stated: "This payment will satisfy all obligations between Stan's, Inc. and Sokota Dairy." Berwald endorsed the check on behalf of Sokota Dairy and negotiated the check on June 20.

[¶8.] On August 17, Berwald's attorney sent a letter to Stan's asserting that the termination of the commodity contract was unwarranted and requesting that it be reinstated or that a new contract be drawn up with identical terms. The letter noted that "no one disputes that the Berwald calves were poisoned by feed containing Rumensin far in excess of ranges acceptable even to adult cattle." The letter further alleged that it appeared from the timeline of events that shortly after Berwald reported to Stan's that his calves were dying, Stan's cancelled the commodity contract due to insufficient credit performance, yet none of the invoices Berwald provided to his counsel "show[ed] any payments past due 30 days."

[¶9.] In April 2015, Berwald filed suit against Stan's. Berwald later filed a second amended complaint, asserting four causes of action: breach of the implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of contract, and barratry. The breach of warranty claims were based upon Berwald's allegation that Stan's produced calf starter contaminated by the improper mixing of ionophores, causing or contributing to the death of more

than 200 of Berwald's calves. Berwald further claimed that Stan's incorporated more than one ionophore into the same feed ration without proper labeling, in violation of SDCL 39-14-55 and FDA guidelines. The breach of contract claim was based upon Stan's cancellation of the commodity contract. Berwald's claim for barratry alleged that Stan's wrongfully filed three counterclaims against Berwald—two of which Stan's later dismissed and one of which the circuit court dismissed.

[¶10.]    Stan's moved for partial summary judgment on the breach of contract claim, contending that Berwald's acceptance and deposit of the June 18 check effected an accord and satisfaction under SDCL 20-7-4 and fully discharged Stan's obligations under the commodity contract. In an amended brief, Stan's argued that SDCL 57A-3-311—the accord and satisfaction provision under South Dakota's Uniform Commercial Code (UCC)—also applied and its requirements did not alter the rule set forth in SDCL 20-7-4. Stan's further argued that all elements of SDCL 57A-3-311 were satisfied.

[¶11.]    Berwald responded that the check Stan's issued to him was not an accord and satisfaction because the parties never agreed to a settlement. He argued that Stan's failed to carry its burden of showing that the check satisfied the elements of accord and satisfaction under SDCL 57A-3-311 because Stan's acted unilaterally to sell the contract without affording him any real opportunity to dispute the transaction, despite his repeated attempts. Berwald noted that Stan's issued the check even after his June 14 objection to the company's plan to cancel the commodity contract.

[¶12.] At the hearing on the motion, the circuit court ruled that both SDCL 20-7-4 and SDCL 57A-3-311 governed the issue. The court found that Stan's tendered the June 18 check to satisfy the commodity contract dispute and at the time of issuing the check "there was a genuine dispute regarding the amount due or the party's liability regarding that amount." The court further found it was undisputed that the accompanying letter conspicuously stated the check was offered in full satisfaction of all obligations between Stan's and Sokota Dairy, and that Berwald received payment by depositing the check. On January 24, 2022, the court entered a written order granting Stan's motion for summary judgment on Berwald's breach of contract claim.

[¶13.] Berwald's claims for breach of the implied warranties and barratry proceeded to a jury trial. Stan's focused its defense largely on causation, asserting that poor facilities and suboptimal feeding practices caused Berwald's cattle losses. In support of this argument, Stan's called Dr. Little as an expert witness. Dr. Little had inspected Berwald's dairy in 2010. Dr. Little was deposed nine months before trial and testified that he recalled taking photographs of the dairy and writing a report but that he was unable to locate either the report or photographs.

[¶14.] One week before trial, Berwald subpoenaed Dr. Little to produce the inspection report he testified to in his deposition. On the first morning of trial, Stan's provided Dr. Little's written report to Berwald's counsel. Then, on the second morning of trial, Stan's provided Berwald's counsel with the photographs taken by Dr. Little during his 2010 inspection. Berwald moved to exclude these materials because of Stan's failure to produce the information in discovery. The

circuit court granted the motion and prohibited Dr. Little from referring to or introducing the report and photographs.

[¶15.]     At the end of the second day of trial, Dr. Little testified.  Stan's did not reference either the report or the photographs during Dr. Little's direct examination, only Dr. Little's recollection of his visit to Berwald's dairy in 2010.  Consistent with his deposition testimony, Dr. Little described Berwald's dairy as "the most deplorable situation [he had] ever seen in a dairy operation," referencing mold growth in silage and a pallet of feed containing high levels of Rumensin.

[¶16.]     During cross-examination, Dr. Little mentioned the photographs that he believed corroborated his testimony, despite the court's order.  Berwald moved to strike that portion of the testimony, and the motion was granted.  However, Berwald's counsel referenced Dr. Little's report multiple times to impeach his testimony without offering it into evidence.

[¶17.]     The jury returned a verdict finding that Stan's breached the implied warranty of fitness for a particular purpose but awarded Berwald no damages, finding that Berwald had failed to show that Stan's breach caused his losses.  The jury found against Berwald on the claims for breach of the implied warranty of merchantability and barratry.  Both parties declined the circuit court's offer to poll the jury.

[¶18.]     Five days after the verdict, the circuit court received a letter from Juror #3 claiming that another juror had an undisclosed professional affiliation with Stan's and had demonstrated bias in favor of Stan's during deliberations.  In the letter, Juror #3 explained that after the trial, he discussed the deliberations

with his wife and described what he perceived as an "extreme bias in favor of Stan's" that had been evidenced by one of the jurors," and that his "wife's comment was, 'well of course she's on the side of Stan's, she's buying a business from Stan's.'" He stated that he decided to report the matter "because of the extreme influence this juror had on [the] deliberations when she was professionally affiliated with Stan's." The circuit court shared this communication with the parties.

[¶19.]    The circuit court subsequently signed a judgment and an amended judgment. Notice of entry of both judgments was filed May 16, 2024. Berwald timely filed a motion for a new trial, arguing that a new trial should be granted based on newly discovered evidence in the form of Dr. Little's report and photographs. He further argued that an outside influence was improperly brought to bear on the jury during deliberations as reflected in Juror #3's post-verdict letter. Berwald claimed the other juror's nondisclosure of her connection to Stan's during voir dire prejudiced his case.

[¶20.]    Stan's objected to Berwald's motion for a new trial and moved to strike the letter and affidavit submitted by Juror #3. Stan's argued that both were inadmissible under SDCL 19-19-606(b) because each contained information that was intrinsic to the jury's deliberation process. Additionally, Stan's filed an affidavit from Stan's general manager stating that Stan's was not selling a business at the time Juror #3 alleged, and that the allegation was untrue. Stan's also argued Dr. Little's report and photographs were not newly discovered because they were available at trial.

[¶21.] The circuit court granted a continuance pursuant to SDCL 15-6-59(b), extending the time for ruling on the motion for a new trial. At a later hearing on the motion, the court orally denied both Berwald's motion for a new trial and Stan's motion to strike. On July 8, the court entered a written order denying the motions, accompanied by findings of fact and conclusions of law. The court found that "[a] juror was one of several people who purchased a business from [Stan's] years before trial." However, it concluded that Juror #3's letter and affidavit described purely intrinsic deliberation matters barred by SDCL 19-19-606(b) and, thus, were inadmissible. It further found that Berwald failed to show extrinsic interference or prejudice, as required to impeach a verdict. On the newly discovered evidence claim, the court determined that Berwald had received the report and photographs during trial, used the report for impeachment, and could not demonstrate that the materials were anything more than cumulative or impeaching, or that their earlier disclosure would probably have changed the result.

[¶22.] Berwald appeals raising two issues:

1. Whether the circuit court erred in granting summary judgment on Berwald's breach of contract claim.

2. Whether the circuit court abused its discretion in denying Berwald's motion for a new trial.

**Standard of Review**

[¶23.] "We review a circuit court's entry of summary judgment under the de novo standard of review." *Smith Angus Ranch, Inc. v. Hurst*, 2021 S.D. 40, ¶ 13, 962 N.W.2d 626, 629 (quoting *Est. of Stoebner v. Huether*, 2019 S.D. 58, ¶ 16, 935 N.W.2d 262, 266). "Under de novo review, '[w]e give no deference to the circuit

court's decision[.] Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied." *Id.* (alterations in original) (citation omitted). The circuit court's entry of a denial of motion for new trial is reviewed for an abuse of discretion. *Surgical Inst. of S.D., P.C. v. Sorrell*, 2012 S.D. 48, ¶ 9, 816 N.W.2d 133, 136–37. "All inferences are indulged in favor of the nonmoving party; if competent evidence exists to support the verdict, it will be upheld." *Id.* ¶ 9, 816 N.W.2d at 137 (quoting *Baddou v. Hall*, 2008 S.D. 90, ¶ 33, 756 N.W.2d 554, 562).

## Analysis

### *Jurisdiction*

[¶24.] Before considering the merits of this appeal, we first address a jurisdictional issue. Berwald filed his notice of appeal on July 29, 2024, listing the January 24, 2022, order granting Stan's motion for partial summary judgment and the July 8, 2024, order denying a new trial. The notice of appeal did not reference the underlying judgment. This Court directed the parties to address whether the failure to reference the underlying judgment in the notice of appeal deprived the Court of jurisdiction. *See Wilge v. Cropp*, 74 S.D. 511, 54 N.W.2d 568 (determining the Court lacked jurisdiction to review an appeal from an order denying a motion for new trial when the appellant did not appeal the underlying judgment). After reviewing the parties' initial responses, the Court took the issue of jurisdiction with the merits of the case. At the time, our decision in *Stock v. Garrett*, 2025 S.D. 8, 17 N.W.3d 856, had not yet been issued, nor was it referenced in the parties' briefing, as the opinion was released one day before Berwald submitted his reply brief.

#30783

[¶25.]     "This Court has only such appellate jurisdiction as may be provided by the legislature.  The right to appeal is statutory and therefore does not exist in the absence of a statute permitting it."  *Wegner v. Siemers*, 2018 S.D. 76, ¶ 4, 920 N.W.2d 54, 55 (citation omitted).  "SDCL 15-26A-3 identifies the judgments and orders of circuit courts that may be appealed to this Court" and it has consistently been interpreted as a limit to this Court's jurisdictional authority.  *Stock*, 2025 S.D. 8, ¶ 22, 17 N.W.3d at 856 (quoting *Goens v. FDT, LLC*, 2022 S.D. 71, ¶ 4, 982 N.W.2d 415, 417).  SDCL 15-26A-3 does not provide for an appeal of right from an order denying a motion for a new trial.  However, a motion for a new trial is reviewable by this Court on an appeal from a judgment.  *See* SDCL 15-26A-7 ("On appeal from a judgment the Supreme Court may review any order, ruling, or determination of the trial court, including an order denying a new trial, and whether any such order, ruling, or determination is made before or after judgment involving the merits and necessarily affecting the judgment and appearing upon the record.").

[¶26.]     While this Court has consistently held that the timely filing and service of a notice of appeal is "a jurisdictional prerequisite to perfecting an appeal" under SDCL 15-26A-6, we have also recognized that SDCL 15-26A-4 sets forth several "Court created procedural rules for filing appeals, including a requirement that the notice of appeal 'shall designate the judgment, order, or part thereof appealed from[.]'"  *Stock*, 2025 S.D. 8, ¶¶ 23–24, 17 N.W.3d at 856 (alteration in original) (quoting SDCL 15-26A-4(1)).  Further, SDCL 15-26A-4, provides that the "[f]ailure of an appellant to take any step other than timely service and filing of a

-11-

notice of appeal does not affect the validity of the appeal, but is ground only for such action as the Supreme Court deems appropriate, which may include dismissal of the appeal." In *Stock*, we held that the failure to reference the underlying judgment in a notice of appeal is a failure to comply with the procedural requirement in SDCL 15-26A-4 and not a jurisdictional defect, if the notice of appeal is otherwise timely filed from the entry of the judgment. 2025 S.D. 8, ¶ 29, 17 N.W.3d at 858.[3]

[¶27.] Although Berwald did not refer to the judgment, he timely filed and served the notice of appeal, satisfying the jurisdictional requirement in SDCL 15-26A-6. However, he failed to comply with the procedural requirement in SDCL 15-26A-4(1) by failing to "designate the judgment, order, or part thereof appealed from[.]" Nonetheless, we have stated "notices of appeal should 'be liberally construed in favor of their sufficiency.'" *Ries v. JM Custom Homes, LLC*, 2022 S.D. 52, ¶ 9, 980 N.W.2d 217, 221 (citation omitted). "In considering the sufficiency of the content of the notice [of appeal,] . . . if the intent of the appellant to appeal from a judgment may be inferred from the text of the notice and if the appellee has not been misled by the defect the appeal will be entertained." *Int'l Union of Operating Eng'rs v. Aberdeen Sch. Dist.*, 463 N.W.2d 843, 844 (S.D. 1990) (quoting *Blink v. McNabb*, 287 N.W.2d 596, 598–99 (Iowa 1980)).

[¶28.] The motion for a new trial was ultimately a challenge to the underlying jury verdict and the judgment incorporating that verdict. Additionally, the discovery issue in the motion for a new trial was subsumed in the same issue

---

3. To the extent that *Wilge*, 54 N.W.2d 568, treated the omission of judgment in an otherwise timely notice of appeal as jurisdictional, *Wilge* should no longer be considered controlling.

raised by Berwald at trial. Stan's has not claimed it was prejudiced or misled by the omission, and the record contains no evidence of prejudice stemming from the failure to identify the judgment in the notice of appeal. Finding Berwald's omission in the notice of appeal was not jurisdictional, we proceed to the merits of the appeal.

*Accord and satisfaction*

[¶29.] Berwald contends the circuit court erred in granting summary judgment on the breach of contract claim because Stan's failed to establish that there were no genuine issues of material fact that the June 18 check constituted an accord and satisfaction. Berwald acknowledges that the letter enclosed with the June 18 check stated the payment would "satisfy all obligations between Stan's, Inc. and Sokota Dairy," but he argues that he had already expressly objected to both the cancellation of the commodity contract and to a payment for the difference between the contract price and the CBOT price as satisfaction. Because Stan's unilaterally terminated the commodity contract, Berwald maintains that there was never an agreement to settle the cancelled contract.

[¶30.] Stan's responds that the check and accompanying letter unequivocally represented a good faith offer to settle a bona fide dispute. Stan's maintains it is undisputed that Berwald accepted and deposited the check without any qualifying or limiting endorsement—and without explicitly objecting to the terms. As a result, Stan's contends that Berwald agreed to the full and final settlement of the commodity contract dispute, thereby extinguishing any remaining claim under that agreement.

[¶31.] "Accord and satisfaction is a matter of statute in this state." *Scholl v. Tallman*, 247 N.W.2d 490, 491 (S.D. 1976). The applicable statutes—SDCL 20-7-1 et seq.—"make clear that it is basically a matter of contract between the parties." *Id.* (citing *Lang v. Burns*, 77 S.D. 626, 97 N.W.2d 863 (1959)). Thus, a valid "accord and satisfaction must satisfy all elements of a binding contract" which includes an offer, acceptance, and consideration. *Id.*

[¶32.] The parties cite to both SDCL 20-7-4 and SDCL 57A-3-311 in addressing the accord and satisfaction issue in this case. While SDCL 20-7-1 et seq. sets forth the general rules for accord and satisfaction, SDCL 57A-3-311 governs an accord and satisfaction by way of negotiable instrument. *See* SDCL 57A-3-104, cmt. 1 ("The definition of 'negotiable instrument' defines the scope of Article 3[.]"); *and* SDCL 57A-3-104 (defining a negotiable instrument to include a check—that is, a draft "payable on demand and drawn on a bank," or a cashier's or teller's check). The June 18 check made payable to Berwald as Sokota Dairy is a "negotiable instrument" within SDCL 57A-3-104, therefore SDCL 57A-3-311 controls.[4]

[¶33.] In relevant part, SDCL 57A-3-311 provides:

---

4. SDCL 57A-3-311 "follows the common law rule [for accord and satisfaction] with some minor variations to reflect modern business conditions." SDCL 57A-3-311, cmt. 3. These "minor variations" are largely in reference to subsections (c) and (d), which are inapplicable in the present case. In contrast, SDCL 20-7-4 altered the common law rule for accord and satisfaction outside the UCC. *See Eberle v. McKeown*, 83 S.D. 345, 159 N.W.2d 391, 394 (1968) (explaining that SDCL 20-7-4 avoids the common law rule that the acceptance of a partial payment of a liquidated debt does "not constitute a valid accord and satisfaction"). Therefore, our cases addressing accord and satisfaction under SDCL 20-7-4 are inapplicable in cases involving negotiable instruments to the extent they contradict the requirement in SDCL 57A-3-311(a)(ii) that "the amount of the claim was unliquidated or subject to a bona fide dispute[.]"

(a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

(b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

[¶34.]    It is undisputed that Stan's sent the June 18 check with an "accompanying written communication contain[ing] a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim" as required for accord and satisfaction to discharge an indebtedness under SDCL 57A-3-311(b). However, "[t]he person seeking the accord and satisfaction must prove that the requirements of subsection (a) are met." SDCL 57A-3-311, cmt. 4. Therefore, to discharge a claim under subsection (b), the party seeking accord and satisfaction must first show that (1) the person tendered the instrument in good faith to satisfy the claim; (2) the amount of the claim was unliquidated or subject to bona fide dispute; and (3) the claimant obtained payment of the instrument.

[¶35.]    "In summary judgment proceedings, '[t]he burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.'" *City of Sioux Falls v. Strizheus*, 2022 S.D. 81, ¶ 18, 984 N.W.2d 119, 124 (quoting *Gail M. Benson Living Tr. v. Physicians Off. Bldg., Inc.*, 2011 S.D. 30, ¶ 9, 800 N.W.2d 340, 343). "The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists." *Id.* ¶ 15, 984 N.W.2d at 123–24 (citation omitted). We turn then to the

record to determine whether there is no genuine issue of material fact concerning the three elements within SDCL 57A-3-311(a).

[¶36.] To satisfy the first requirement of SDCL 57A-3-311(a), Stan's had the burden of proving it tendered the check "in good faith . . . as full satisfaction of the claim[.]" SDCL 57A-3-311(a). *See McMahon Food Corp. v. Burger Dairy Co.*, 103 F.3d 1307, 1313 (7th Cir. 1996) (to meet the criteria of UCC § 3-311(a) "a party must ordinarily prove that he or she acted in good faith in tendering an instrument as full satisfaction of a claim[.]"). Under the UCC, good faith means "honesty in fact and the observance of reasonable commercial standards of fair dealing." SDCL 57A-1-201(b)(20). "The meaning of 'fair dealing' will depend upon the facts in the particular case." SDCL 57A-3-311, cmt. 4.[5]

[¶37.] Stan's presented undisputed evidence that it tendered the June 18 check in the amount of $6,921.57, based upon the prevailing market price for soybean meal, to Berwald as an offer to settle any claim Berwald may have had arising from Stan's cancellation of the commodity contract. When Stan's mailed the June 18 check to Berwald, Stan's had already twice notified Berwald of the

---

5. The official comments to UCC § 3-311 provide two examples of what would be considered a tender not in good faith. *See* SDCL 57A-3-311, cmt. 4. The first example is an insurance company that sends a check in an unreasonably small amount knowing that the insured is destitute. "If the trier of fact determines that the insurer was taking unfair advantage of the claimant, an accord and satisfaction would not result from payment of the check because of the absence of good faith by the insurer in making the tender." *Id.* The second example is a business which prints settlement language on all checks whether or not any dispute is involved. *See id.* ("Use of a check on which full satisfaction language was affixed routinely pursuant to such a business practice may prevent an accord and satisfaction on the ground that the check was not tendered in good faith[.]"). Neither example has any application in this record.

contract's cancellation—first by phone on June 7, 2012, and again in the June 11 letter. That letter confirmed Stan's intent to buy out the commodity contract by paying Berwald the difference between the higher prevailing price for soybean meal futures on the CBOT and Berwald's contracted price, less the balance it claimed was owed by Berwald for delivered soybean meal. Accompanying the June 18 check was a letter containing an itemized calculation of the $6,921.57 payment to Berwald for the cancellation of the commodity contract as well as an explicit statement that "[t]his payment will satisfy all obligations between Stan's, Inc. and Sokota Dairy." At the time of this letter, Stan's knew that Berwald was represented by counsel.

[¶38.] Berwald neither argued nor offered evidence to refute Stan's showing that it acted in good faith in tendering the June 18 check in full satisfaction of Berwald's claim. Berwald did not present any evidence to show that Stan's conduct in tendering the June 18 check was inconsistent with standard industry practices or that the amount of the check did not constitute fair compensation as an accord to resolve the dispute. There was no claim Stan's calculation was incorrect, arbitrary, or misrepresented the facts. Although Berwald disputes the propriety of the commodity contract's cancellation and claims greater damages, these arguments focus on the alleged wrongfulness of the cancellation, not Stan's actions in tendering the June 18 check to resolve the dispute arising from the cancellation. Further, Berwald presented no evidence to support his claim that he sustained greater damages than those reflected in Stan's tender. While good faith may often be a question of fact, because the evidence is undisputed that Stan's tendered the June 18 check in good faith to resolve the dispute arising from the commodity contract's

cancellation, the first requirement of SDCL 57A-3-311(a) was established as a matter of law on this record.

[¶39.]     To satisfy the second requirement in SDCL 57A-3-311(a), "the person against whom a claim is asserted [must] prove that the amount of the claim was unliquidated or subject to a bona fide dispute *prior* to submission of the instrument representing full and final payment." 1 Am. Jur. 2d Accord and Satisfaction § 19 (2025) (emphasis added). *See also Thomas Creek Lumber & Log Co. v. United States*, 36 Fed. Cl. 220, 238 (1996) ("The legal doctrine of accord and satisfaction assumes that a bona fide dispute exists prior to discharge of the debt."). "Section 3-311 does not apply to cases in which the debt is a liquidated amount and not subject to a bona fide dispute." SDCL 57A-3-311, cmt. 4. "[T]he 'bona fide dispute' must be a dispute between the parties and not one confined to the mind of the sender of the check[.]" 1 Am. Jur. 2d Accord and Satisfaction § 19 (2025). Further, a party's arbitrary refusal to perform under a contract cannot create a dispute sufficient to support an accord and satisfaction. *See Flambeau Prods. Corp. v. Honeywell Info. Sys., Inc.,* 341 N.W.2d 655, 664 (Wis. 1984).

[¶40.]     It is undisputed that a bona fide dispute existed between Stan's and Berwald prior to the tender of the June 18 check. In its June 11 letter, Stan's notified Berwald for the second time that it would be cancelling the commodity contract due to insufficient credit performance, claimed that Berwald owed an outstanding balance of $5,982.75 for delivered soybean meal, and proposed a buyout calculation based on CBOT futures. Prior to Stan's tender of the June 18 check, Berwald's counsel expressly disputed these claims, as well as the adequacy of the

proposed buyout calculation. Throughout the case, Berwald has consistently disputed that he had been late in making payments to Stan's for the soybean meal. Thus, the record unequivocally demonstrates that there was a genuine dispute concerning the payment terms under the commodity contract and Berwald's compliance with those terms prior to the contract's cancellation and before Stan's tendered the June 18 check.

[¶41.] There is also no dispute that the claim was unliquidated. An unliquidated claim is one which cannot be determined with exactness from the parties' agreement nor "by the application of rules of arithmetic or of law." 3 Williston on Contracts § 7:35 (4th ed.). *See also* Restatement (Second) of Contracts § 74 (1981) cmt. c. (defining an unliquidated obligation as one that "is uncertain or disputed in amount"). When Stan's cancelled the commodity contract on June 15, Berwald still had 274.56 tons left to receive at $319 per ton through September 30, 2012, under the contract. Because Stan's right to cancel the contract was disputed, Berwald had a claim for damages governed by South Dakota's version of the UCC, the amount of which depended on variable market prices for soybean meal until the contract's expiration in September.[6]

---

6.  Under SDCL 57A-2-711, which governs a buyer's remedies for a seller's repudiation, Berwald could elect to "cover" by purchasing substitute soybean meal and recover the difference between the cost of cover and the contract price or seek damages for nondelivery—the difference between the market price when he learned of the breach and the contract price. *See* SDCL 57A-2-711 to 713. In either case, however, the computation of damages also must include incidental and consequential damages under SDCL 57A-2-715, all of which were contingent and unknown at the time Stan's sent the June 18 check.

[¶42.] Finally, the third requirement of SDCL 57A-3-311(a) is also undisputed. Berwald endorsed and deposited the check on June 20, 2012. As the official comments explain, "obtaining acceptance of a check is considered to be obtaining payment of the check." SDCL 57A-3-311, cmt. 4. Thus, Berwald's endorsement and deposit of the check satisfies the third requirement under SDCL 57A-3-311(a) that the claimant "obtained payment" of the instrument.

[¶43.] It makes no difference that Berwald objected to the cancellation of the contract in the June 14 letter because SDCL 57A-3-311 follows the common law, and under the common law "words of protest do not prevent accord and satisfaction." *Scholl*, 247 N.W.2d at 492. While this Court has previously held that the predecessor statute to SDCL 57A-1-308 permitted a creditor to make an explicit reservation of rights to prevent its endorsement of a check marked "Settlement in Full" from constituting "acceptance in writing" of an accord under SDCL 20-7-4, SDCL 57A-1-308 has since been amended to explicitly state that the section "does not apply to an accord and satisfaction." SDCL 57A-1-308(b).

[¶44.] Berwald's claim for breach of the commodity contract was discharged under SDCL 57A-3-311(b) when he deposited the June 18 check because there is no genuine dispute of material fact that Stan's satisfied the three prerequisites for accord and satisfaction under SDCL 57A-3-311(a). Accordingly, the circuit court properly granted summary judgment on Berwald's claim for breach of contract.

***Motion for new trial***

> a. *Whether a new trial should be granted pursuant to SDCL 15-6-59(a)(4) because of newly discovered evidence*

[¶45.]       To prevail on a motion for a new trial under SDCL 15-6-59(a) based upon newly discovered evidence, the moving party must prove:

> (1) the evidence was undiscovered by the movant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) that it would probably produce [a different result]; and (4) that no lack of diligence caused the movant to fail to discover the evidence earlier.

*State v. Otobhiale*, 2022 S.D. 35, ¶ 30, 976 N.W.2d 759, 770. *See also Barnaud v. Belle Fourche Irrigation Dist.*, 2000 S.D. 57, ¶ 24, 609 N.W.2d 779, 784-85 (requiring the same showing by the moving party in a civil case). "Moreover, '[n]ew trial motions based on newly discovered evidence request extraordinary relief; they should be granted only in exceptional circumstances and then only if the requirements are strictly met.'" *Klutman v. Sioux Falls Storm*, 2009 S.D. 55, ¶ 38, 769 N.W.2d 440, 454 (citation omitted) (alteration in original).

[¶46.]       The circuit court correctly determined that Berwald failed to show that the evidence was undiscovered at the time of trial. Berwald was aware of the existence of the unproduced report and photographs for nine months before trial. Additionally, Berwald possessed and had an opportunity to review both items before the evidentiary record closed at the end of the second day of trial—more specifically, before Dr. Little testified. Berwald argues that the late disclosure prejudiced his ability both to respond to the report and photographs and to cross-examine Dr. Little. But Berwald made no attempt to subpoena the evidence from Dr. Little until one week before trial. While Stan's was obligated to seasonably supplement its

-21-

discovery responses, Berwald made no attempt to enforce compliance with the discovery rules at any time before trial. After the issue was raised at trial, the court imposed an appropriate discovery sanction by excluding the belatedly produced report and photographs, and neither party has challenged this ruling.

[¶47.] The circuit court's determination that the evidence was not newly discovered was alone a sufficient basis to deny Berwald's motion for a new trial. However, the court also properly determined that Berwald failed to show the evidence was material for purposes other than impeachment or that the late disclosure was prejudicial. Dr. Little testified in detail about what he recalled from his investigation of Berwald's dairy facilities in 2010 in his deposition and again at trial. While newly discovered evidence that is merely cumulative or impeaching is generally an insufficient basis for a new trial on its own, this Court has recognized that there may be circumstances where "[n]ewly discovered impeachment evidence may be . . . of such a material weight that it would probably produce" a different result at a new trial. *Otobhiale*, 2022 S.D. 35, ¶ 32, 976 N.W.2d at 771. In this instance, however, Berwald was already able to use the materials to cross-examine Dr. Little at trial and he has failed to show that "there is a reasonable probability" the earlier production of the information in the report and photographs "would probably produce a different result at a new trial." *Bridgewater Quality Meats, L.L.C. v. Heim*, 2007 S.D. 23, ¶ 19, 729 N.W.2d 387, 394 (quoting *State v. Steele*, 510 N.W.2d 661, 664 (S.D. 1994).

> b. *Whether a new trial should be granted pursuant to SDCL 15-6-59(a)(2) due to juror misconduct*

[¶48.] A court may grant a new trial for jury misconduct pursuant to SDCL 15-6-59(a)(2). However, the court is "precluded from considering juror affidavits that explain any matter or statement that occurred during the course of jury deliberations or anything that affected the minds or emotions of the jurors unless the affidavit relates to extraneous prejudicial information or outside influence that was improperly brought to the attention of the jury." *State v. Birdshead*, 2015 S.D. 77, ¶ 20, 871 N.W.2d 62, 71 (citing SDCL 19-19-606(b)). Conversely, "[e]xtrinsic information that goes beyond the mental processes of one juror and becomes known to other jurors can prejudice a jury verdict and affect the substantial rights of the party seeking a new trial." *Russo v. Takata Corp.*, 2009 S.D. 83, ¶ 43, 774 N.W.2d 441, 452. "Our standard requires a showing that 'a typical reasonable, or normal juror could have been influenced by the facts presented.'" *Id.* (quoting *State v. Wilkins*, 536 N.W.2d 97, 100 (S.D. 1995).

[¶49.] Juror #3's post-verdict letter and affidavit raised concerns about another juror being biased in favor of Stan's because of a business relationship, a fact Juror #3 claimed to have learned about after trial. Accepting the assertion at face value, the content of the letter and affidavit relates in part to an undisclosed outside influence on one of the jurors.

[¶50.] There is no claim, however, that any of the jurors were aware of this alleged relationship during deliberations, or that the juror had discussed any alleged business relationship with Stan's during deliberations. Instead, the letter primarily describes how that juror "had an extreme influence on jury deliberations."

This is precisely the sort of intrinsic information SDCL 19-19-606(b)(1) bars. *See also Russo*, 2009 S.D. 83, ¶ 28, 774 N.W.2d at 448 ("The [language of SDCL 19-19-606(b)(1)] limits the type of information that a juror may be asked to provide via an affidavit or under oath at a hearing on a motion for new trial."). The rule limits evidence to extrinsic information, such as "media publicity, conversations between jurors and non-jurors, and evidence not admitted by the court." *Id.* ¶ 29, 774 N.W.2d at 448. Further, extrinsic evidence is not presumptively prejudicial unless it "goes beyond the mental processes of one juror and becomes known to other jurors." *Id.* ¶ 43, 744 N.W.2d at 452.

[¶51.]  Finally, although Juror #3 suggested that the juror may have been biased by an extrinsic relationship with Stan's, the record does not show any prejudice arising from any perceived favorable bias of a single juror. A verdict of ten of the twelve jurors "shall be the verdict of the jury and so recorded." SDCL 15-14-25. Both parties waived their right to poll the jury and the record does not demonstrate that any juror's vote would have changed the verdict. *See* SDCL 15-14-26 ("If neither party requires the jury to be polled the verdict is complete and the jury discharged from the case[.]").

[¶52.]  Therefore, the circuit court acted within its discretion in denying the motion for new trial based upon alleged newly discovered evidence under SDCL 15-6-59(a)(4) or alleged juror misconduct under SDCL 15-6-59(a)(2).

[¶53.]  We affirm.

[¶54.]  KERN, SALTER, DEVANEY and MYREN, Justices, concur.